# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| COMPREHENSIVE SECURITY, INC., et al., | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) No. 3:18-cv-00375<br>) |
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, | )<br>)<br>)<br>) |
| Defendant. | )<br>) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This antitrust case concerns private security services in Davidson County, Tennessee. For years, private companies, including Plaintiffs, were the primary suppliers of private security services in Davidson County. Those private companies hired off-duty Metropolitan Nashville Police Department ("MNPD") officers to provide part-time security services. Beginning in 2013, MNPD started a five-year plan to transition the secondary employment of off-duty MNPD officers away from private companies. As MNPD implemented this transition, it also decided to enter the private security services market. In order to win business, MNPD lowered rates, changed administrative procedures, and eventually prohibited off-duty MNPD officers from working for private security companies. MNPD won a number of contracts previously held by private security companies and became a significant player in the private security services market.

Plaintiffs allege a disruption caused by MNPD's aggressive, competitive, and successful entry into the private security services market. They argue that MNPD was successful through the use of anticompetitive conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

("Section 2").[1] A bench trial was held on November 12 through 16, 2020, (Doc. Nos. 138-140), and the parties submitted post-trial briefs. (Doc. No. 137, 145, 146). The Court makes the following Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

### The Private Security Services Market In Davidson County, Tennessee

1. Plaintiffs are three long-established private security companies operating in Davidson County, Tennessee. Comprehensive Security, Inc. ("Comprehensive") is headed by Loyd Poteete, a former MNPD officer. Associated Protected Services ("APS") is owned by Michael Woods, a former Millersville, Tennessee police officer. OnTrac Security is operated by Ralph Douglas Jones, a formed MNPD sergeant.

2. Plaintiffs offer traditional police and security services to the public, including site security, asset security, traffic control, crowd control, individual protection and other similar security services.

3. In order to deliver police and other security services, Plaintiffs hire off-duty police officers as part-time employees on an as-needed basis. (Doc. No. 138 at 16-26, 157-60). Those off-duty officers are either commissioned by the Tennessee Peace Officer Standards & Training Commission ("POST officers") or without a POST commission. (Id. at 17-19, 26, 159-63, 191). The distinction is significant because only POST officers can make arrests and direct traffic on public streets. (Id. at 16; Doc. No. 139 at 26; Doc. No. 140 at 66). Most of the off-duty officers typically work full-time for local and state governmental law enforcement agencies, such as MNPD, and receive employment benefits and annual training through that employment. As a

---

[1] Plaintiffs abandoned their Section 2 predatory pricing claim. (Doc. No. 145 at 2, 32).

result, private security companies benefit greatly from having access to trained off-duty officers who desire sporadic, additional part-time work pay without incurring the training cost or other costs associated with regular employees. (Doc. No. 139 at 116). Having this ready labor made it easier for private security companies, like Plaintiffs, to fulfill their contractual security obligations in Davidson County. (Doc. No. 138 at 171-72).

4.  MNPD facilitated the success of private security companies through secondary employment policies and procedures. As far back as the 1990s, an MNPD officer who wanted to work part-time for a private security company could submit a secondary employment work request, known as a Form 150, and approval was "pretty much guaranteed." (Doc. No. 138 at 173; see also id. 51-52; Doc. No. 119-20). In 1997, MNPD created the Secondary Employment Unit ("SEU"), to help MNPD officers obtain approval of secondary employment requests. The SEU gave private security companies "very easy" access to a "great pool" of MNPD officers that were "on standby constantly." (Doc. No. 138 at 51-53, 172).

5.  The cooperative relationship between MNPD and private security companies extended to Metro's Special Events Committee, which consisted of representatives from the Mayor's Office, Public Works, Metro Parks, MNPD, Metro Fire, and special event coordinators. The Committee's responsibilities included the planning, permitting, and approval of special events in Davidson County. (Id. at 37-38, 175; Doc. No. 139 at 57-58). The inclusion of Plaintiffs and other private security companies reflected the then market reality that private security companies did the "lion's share of [the private security] work," and were able to share their expertise on security, road closures, and traffic control. (Doc. No. 139 at 58-59).

3

**Chief Anderson's Five-Year Transition Plan for MNPD**

6. In April 2013, then MNPD Chief Steve Anderson announced a five-year transition plan to change "the future of secondary employment of [MNPD] police officers" and to ensure the "safety" of citizens and visitors. (Ex. 68 at 2, 6). In an April 26, 2013 email to city officials, Chief Anderson explained that "practices relating to the off-duty employment of police officers that were in place 20 years ago would not be acceptable today." (Id. at 2). He explained that there was "little or no regulation or oversight as to how, or even where, officers used their police authority in off-duty employment," and that without "sufficient oversight, there is the real potential, and as we have seen in other cities, [for] the reality of inappropriate conduct, favoritism, misbehavior and/or corruption." (Id.) He was committed to "improving accountability and reducing liability to the city" by changing the availability and controls surrounding secondary employment of off-duty MNPD officers. (Id.)

7. Chief Anderson also determined that continued employment of MNPD officers by private security companies had "the potential to divide an [MNPD] officer's loyalties, create conflicts of interest and otherwise have a detrimental effect on the operation of the Metropolitan Government." (Id. at 3). So, he decided to restrict officers' secondary employment by requiring that all private security services work be approved by MNPD. (Id.) This would enable MNPD to "limit its liability and exercise sufficient control so as to minimize any detrimental impact [secondary employment] can create." (Id.) The change would also help MNPD become more "professional [and] coordinated," and "enhance public safety and service." (Id. at 6).

8. The transition plan for MNPD officers' secondary employment would occur over five years to avoid any "outcry" over sudden change to an existing system "[e]ngrained into the culture of Nashville." (Id.) It was important to Chief Anderson that special event planners would

4

not hire MNPD officers directly unless the fees charged by MNPD were "reasonable and affordable." (Id. at 5). He explained that it was "imperative" that MNPD "give the Nashville community and event organizers an affordable way to have Metropolitan Nashville police officers staff their events." (Id. at 5-6).

9. MNPD Captain David Corman, the head of SEU from 2010 to 2019, was responsible for implement Chief Anderson's five-year transition plan. (Doc. No. 140 at 76).

10. Beginning in April 2013, Corman began the process. First, the focus of SEU changed to obtaining private security contracts for MNPD that could be directly staffed with MNPD officers. (Doc. No. 139 at 37). MNPD Sergeant Kim Forsyth testified that Corman was concerned that private security companies were using MNPD's officers to make their own money, and he became excited at the prospect of generating business for MNPD. (Id. at 37-38). Forsyth, a witness offered by Plaintiffs, was very critical and accusatory of Corman. She believed that Corman wanted to make as much money as possible for MNPD and operated SEU with the goal of eliminating the work available to private security companies so that eventually they would be forced out of business. At trial, she was nervous, unsure, fearful and contrived. She lacked any direct or indirect knowledge about MNPD's anti-competitive activities or motive. Instead, her testimony consisted of aggressive, prepackaged speeches that were often not responsive to questions. Overall, the Court found Forsyth not credible, and likely influenced by personal feelings about Corman.

11. Second, Corman implemented administrative changes to add "more structure" and "more oversight" to the Form 150 process for approving secondary requests. (Doc. No. 140; see also Doc. No. 138 at 51-57, 173-75). For example, MNPD required multiple escalating levels of approval – first by the captain or precinct commander, then by the head of SEU, and eventually by

5

Chief Anderson. (Doc. No. 54-55, 173). MNPD also made a determination on each private security work opportunity to access whether it was "worthwhile." (Id. at 173-74). As a result, it became more difficult to get Form 150 approvals, and private security companies began to rely more on non-MNPD officers. (Id. at 78-80, 87-90).

12. Third, the five-year transition plan also changed the operation of the Special Events Committee. No longer were private security companies, like Plaintiffs, invited by Metro to attend meetings. Instead, they had to be invited by special event planners to discuss individual projects. (Id. at 69-70, 195-97; Doc. No. 140 at 140-41). The most significant change occurred when MNPD began promoting itself to special event planners to provide private security services for their events. (Doc. No. 138 at 176, 196; Doc. No. 139 at 71-72). As Michael Woods of Plaintiff APS conceded, MNPD was merely "let[ting] [event organizers] know they had other options." (Doc. No. 138 at 198).

13. Between 2013 and 2018, Plaintiffs, and other private security companies, felt the impact of MNPD entrance into the private security market. In their case-in-chief, Plaintiffs painted an impressive picture through multiple private security companies who told stories of losing business to MNPD. According to them, MNPD used the Special Events Committee, control over the availability of off-duty MNPD offers through the Form 150 process, the parade permit process and the approval process for road closure to systemically take business that previously went to Plaintiffs and other private security companies. A few examples illustrate MNPD's takeover of the customer base for the private security market:

- For many years, Patrick McKellar and his company provided security for the annual Iroquois Steeplechase event, until he lost that work to MNPD.

- George H. Curry, Jr. provided security services for all events at the Ryman Auditorium and the Grand Ole Opry House until he lost that work to Ryman's in-house security force in 2018 because he could no longer employ MNPD officers.

- Doug Jones provided security services for TriStar Hospitals, which are part of the HCA family of companies. His contract approached 1 million dollars and was lost to MNPD in 2018.

- Also in 2018, Chaz Vetter, owner of Premier Protective Services, Inc., provided security services to the State Fairgrounds for at least six years until he lost that work to MNPD.

- Comprehensive, owned by Loyd Poteete, lost its customer, the Nashville Pride Festival to MNPD, which provided security services for free.

- APS, owned by Michael Woods, lost work for the Nashville Pride Festival and the Nashville Christmas Parade to MNPD.

**Completion of the Five-Year Transition Plan**

14. On March 2, 2018 – almost exactly five years after announcing the five-year transition plan – Chief Anderson issued a memorandum ending MNPD's approval of MNPD officers' requests to perform off-duty work for private security companies. (Ex. 6; Doc. No. 138 at 60-61; Doc. No. 139 at 14). This effectively ended Plaintiffs' ability to hire off-duty MNPD officers to staff their private security services contracts. Now, Plaintiffs had to use non-MNPD officers. (Doc. No. 138 at 90-94).

15. As a result, SEU now "operate[s] the same way" as a private security company and "provide[s] businesses or individuals an opportunity to hire [MNPD] police officers" for private security services. (Doc. No. 140 at 36, 113). SEU has been very successful. (Doc. No. 139 at 47,

7

49, 81-82). MNPD has obtained a number of significant contracts previously held by Plaintiffs and other private security companies. In some cases, MNPD even offered free or discounted private security services to the public. (Doc. No. 138 at 28-32; 178-80).

16. MNPD rates for private security services reflects its entrance into, and competition within, the private security market. From 2009 until 2013, Metro's range for hourly services ranged from $66.00 per hour to $116.00 per hour, much higher than the private security companies. Ex. 61 at 1. But in 2013, when MNPD began to implement Chief Anderson's five-year transition plan, MNPD lowered the range to $40.00 per hour to $75.00 per hour. (Id.) There was a small increase in 2017 to a range of $44.50 per hour to $79.50 per hour, encompassing completion of the five-year plan in 2018. (Id. at 2.) Finally, in 2020 to 2021, after MNPD had obtained many of Plaintiffs' and other private security companies' clients, the range had a modest increase to $46.50 per hour to $79.50 per hour. (Id.)

**Expert Opinions**

17. At trial, the Court qualified two witnesses as experts under Federal Rule of Evidence 702: Dr. Gilbert Mathis, Professor Emeritus of Economics at Murray State University, on behalf of Plaintiffs (Ex. 40), Dr. Charles L. Baum II, Professor of Economics at Middle Tennessee State University, a rebuttal expert on behalf of Defendant. (Ex. 60). Having considered the testimony of both, the Court gives little weight to Dr. Mathis's opinions because the Court finds them to be flawed due to incomplete analysis.

18. Dr. Mathis opined that MNPD was anticompetitive when it reduced the available labor pool needed by Plaintiffs and other private security companies to compete in the private security services market. According to Dr. Mathis, MNPD increased market power and decreased competition when it restricted off-duty MNPD officers from working for Plaintiffs.

8

19. The Court concludes that Dr. Mathis's opinion is unreliable. (Doc. No. 139 at 136-47, 176-79). First, Dr. Mathis analyzed the wrong market. As credibly explained by Dr. Baum, Dr. Mathis failed to analyze the sell-side market for the supply of private security services that is the basis of Plaintiffs' claim. (Doc. No. 139 at 152). Indeed, contrary to Plaintiffs' own legal arguments, Dr. Mathis insisted that this case concerns buyers, not sellers. (Doc. No. 138 at 120-21). Dr. Mathis compounded this error by rejecting, contrary to the evidence at trial, that the "buyers" relevant to private security services are special event planners and organizers. Instead, Dr. Mathis devised a market in which the buyers are private security companies and the product is off-duty officers employed by law enforcement agencies. (Id. at 112, 121-22; Ex. 40 at 1-3). Because his "labor pool" market focus bears no resemblance to the private security service supply market at issue in this case, Dr. Baum concluded that Dr. Mathis failed to demonstrate that MNPD had market power. (Doc. No. 139 at 133, 137-38). The Court agrees that the labor pool market analysis offers little insight into MNPD's alleged anticompetitive behavior in the supply-side security service market.

20. Even if the labor pool market analysis were relevant, Dr. Mathis used untenable assumptions that undercut his conclusions. In particular, Dr. Mathis did not include all available off-duty officers such as non-POST officers, retired POST officers, Tennessee Highway Patrol officers, and officers in nearby counties. (Id. at 136-47, 190-91). His contrary assumptions are wholly unsupported by the evidence at trial. Rather, the evidence at trial establishes that private security companies routinely hire non-POST officers, retired POST officers, THP officers, and POST officers from law enforcement agencies in geographically distant counties, including as far as Alabama. (Doc. No. 138 at 17-22, 26, 58, 87, 90-91, 163, 191; Doc. No. 139 at 100; Doc. No. 140 at 144). Moreover, Dr. Mathis acknowledged making no attempt to ascertain how many

9

MNPD officers are willing or able to work for private security companies. (Doc. No. 138 at 127-29). Indeed, Dr. Mathis conceded at trial that he did not consider much of the available information about private security companies' labor force; that it was reasonable to consider such data; and that correcting his assumptions with such data would alter his conclusions. (Id. at 114; 118-20; 125-30).

21. The HHI value calculated by Dr. Mathis is also unreliable. The HHI, typically used to evaluate a market in a merger case, has more limited utility in a Section 2 case concerned with the market power of a single firm. Moreover, Dr. Mathis's method for calculating the HHI value likely overstated the results. Again, as Dr. Baum credibly explained, Dr. Mathis considered all of the POST officers in five counties as one "unit," instead of following standard principles and squaring the shares of the employers that supply POST officers in each county. (Doc. No. 139 at 176-83). "[L]umping all the firms in a county together and consider[ing] that to be one entity" makes the labor pool "seem way more concentrated than it really is." (Id.)

22. Finally, Dr. Mathis assumes that the "reasonable available" labor pool for private security companies includes MNPD, but he concedes that MNPD is not obligated to make its officers available to private security companies *at all*. (Doc. No. 138 at 136-37). In rebuttal, Dr. Baum stressed that Dr. Mathis failed to acknowledge that "there is no economic theory . . . that says it's somehow anticompetitive for a company to not allow its workers to work for another company." (Doc. No. 139 at 135-36). Dr. Mathis compounded this error by failing to ever consider the stated purposes for Chief Anderson's MNPD secondary employment transition plan. (Doc. No. 138 at 140). As a result, the labor pool market analysis entirely fails to take into account MNPD's alternate reasons for limiting the outside work of its officers, including "provid[ing] better security and control[ling] MNPD's public image." (Doc. No. 139 at 168, 187).

10

Case 3:18-cv-00375   Document 147   Filed 06/09/21   Page 10 of 17 PageID #: 2131

## CONCLUSIONS OF LAW

### Antitrust Law and the Sherman Act

1.     The antitrust laws protect "competition, not competitors." Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962). To violate the Sherman Act, a firm must engage in anticompetitive conduct "designed to destroy competition, not just to eliminate a competitor." Richter Concrete Corp. v. Hilltop Concrete Corp., 691 F.2d 818, 823 (6th Cir. 1982). Congress authorized Sherman Act scrutiny of a single firm only when the firm poses a danger of monopolization. This strict focus "reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur." Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984). Section 2 thus prohibits only monopolizing, attempting to monopolize, or conspiring with others to monopolize, commerce.[2] 15 U.S.C. § 2; Superior Prod. P'ship v. Gordon Auto Body Parts Co., 784 F.3d 311, 318 (6th Cir. 2015).

2.     To prove monopolization, a plaintiff must prove that a firm: (1) "possess[ed] monopoly power in a relevant market"; (2) "willful[ly] acqui[red], maint[ained], or use[d] [ ] that power by anti-competitive or exclusionary means as opposed to 'growth or development resulting from a superior product, business acumen, or historic accident,'" Conwood Co. v. U.S. Tobacco Co., 290 F.3d 768, 782 (6th Cir. 2002) (quoting Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 595-96 (1985)); and (3) had a general intent to exclude others from the market. Superior Prod. P'ship, 784 F.3d at 319 (quoting Conwood, 290 F.3d at 782).

---

[2] The Clayton Act provides the vehicle to sue for redress under Section 2. Section 16 of the Clayton Act provides in part that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws[.]" 15 U.S.C. § 26.

11

3. To prove attempted monopolization, a plaintiff must prove that a firm: (1) "with a dangerous probability of success, engage[d] in anti-competitive practices the specific design of which [was] to build a monopoly or exclude or destroy competition"; and (2) had a "specific intent to destroy competition or build a monopoly."[3] Conwood, 290 F.3d at 782 (quoting Smith v. N. Mich. Hosps., Inc., 703 F.2d 942, 954 (6th Cir. 1983)); Superior Prod. P'ship, 784 F.3d at 319; Arthur S. Langenderfer, Inc. v. S.E. Johnson Co., 917 F.2d 1413, 1431-32 (6th Cir. 1990). To satisfy the "dangerous probability of success" element, a firm must demonstrably "possess market strength that approaches monopoly power." Langenderfer, 917 F.2d at 1431-32; Tarrant Serv. Agency, Inc. v. Am. Standard, Inc., 12 F.3d 609, 615 (6th Cir. 1993).

4. Consideration of every Section 2 claim begins with two threshold issues: (1) the definition of "the relevant product and geographic markets" in which the plaintiffs compete with the defendant, and (2) whether the defendant, "in fact, possesses monopoly power." Spirit Airlines, Inc. v. Northwest Airlines, Inc., 431 F.3d 917, 932 (6th Cir. 2005) (quoting Conwood, 290 F.3d at 782); see also United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956); Hand v. Cent. Transp., Inc., 779 F.2d 8, 11 (6th Cir. 1985).

5. The proof at trial established, by a preponderance of the evidence, that Plaintiffs and other private security companies primarily used full-time MNPD officers and other law enforcement officers to supply the labor necessary to staff their for-profit companies providing security services to the public. They relied greatly upon MNPD. Their business model worked well because MNPD hired, trained, paid, and controlled their labor source with no direct costs to

---

[3] Specific intent may be inferred from evidence of anticompetitive conduct, Langenderfer, 917 F.2d at 1432, and courts have found "[i]mproper exclusion . . . is always deliberately intended." Spirit Airlines v. NW Airlines, Inc., 431 F.3d 917, 932 (6th Cir. 2005)(citing Aspen Skiing, 472 U.S. at 603).

12

Plaintiffs. Then, in 2013, MNPD changed its administration of its employees. MNPD decided that more management and control was needed to maintain MNPD standards when its employees engaged in off-duty secondary employment. Recognizing that some MNPD officers wanted and needed part-time work for additional pay, MNPD entered the private security services market using its employees. Plaintiffs' claims that MNPD's decision to compete with Plaintiffs is a violation of the antitrust laws is fundamentally flawed. Nothing in Section 2 of the Sherman Act requires MNPD to make its employees available to a for-profit company. Nothing in Section 2 of the Sherman Act requires MNPD to refrain from competing against Plaintiffs in the private security market. Nothing in Section 2 of the Sherman Act makes illegal MNPD decision to compete against Plaintiff. And, certainly nothing in Section 2 of the Sherman Act requires MNPD to help its competition once MNPD enters the market. For the reasons that follow, there is no violation of Section 2 of the Sherman Act in this case.

**Market Definition**

6. Plaintiffs must first accurately define the relevant market in which they compete with MNPD. Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n, 388 F.3d 955, 962 (6th Cir. 2004); see also In re Se. Milk Antitrust Litig., 801 F. Supp. 2d 705, 724 (E.D. Tenn. 2011). The relevant market consists of two components: (1) product or service market, and (2) geographic market. Brown Shoe, 370 U.S. at 324; Spirit Airlines, 431 F.3d at 932-33; In re Se. Milk, 801 F. Supp. 2d at 724. Here, by a preponderance of the evidence, it is apparent that Plaintiffs, MNPD, and other private security companies compete primarily in the Nashville, Davidson County, Tennessee market in the private security market.

7. Plaintiffs contend that the appropriate service market is the supply of private security services "that require POST-commissioned officers." (Doc. No. 132 at 2; Doc. No. 145 at

13

¶ 206). However, Plaintiffs have not proven this narrow definition by a preponderance of the evidence. First, Plaintiffs have offered no antitrust analysis to support the definition. Dr. Mathis disagreed with the definition entirely and offered no relevant analysis of *any* supply market. And Plaintiffs presented no qualitative information to support the definition (e.g., data regarding the number and size of market participants; specific services supplied in the market; cross-elasticity; firms that have left the market; firms that could enter the market; barriers to entry, etc.) Indeed, Dr. Baum credibly opined that Plaintiffs did not even collect the appropriate data to analyze the supply market. (Doc. No. 139 at 139, 152).

### **Monopoly Power**

8.     The Court next considers the "critical factor" of whether MNPD has monopoly power in the relevant market. Byars v. Bluff City News Co., 609 F.2d 843, 850 (6th Cir. 1979) (citing American Tobacco Co. v. United States, 328 U.S. 781, 813-14 (1946)). A single seller has monopoly power when it is able to raise prices or exclude competition when it desires to do so. Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451, 464 (1992) (quoting Fortner Enters., Inc. v. U.S. Steel Corp., 394 U.S. 495, 503 (1969)); see also E.I. du Pont, 351 U.S. at 391.

9.     "The existence of [monopoly] power ordinarily is inferred from the seller's possession of a predominant share of the [relevant] market." Spirit Airlines, 431 F.3d at 935 (quoting Eastman Kodak, 504 U.S. at 464). Although Section 2 does not contain a specific percentage of market share that triggers an inference of monopoly power, courts have adopted a standard that is "very high." In re Se. Milk, 801 F. Supp. 2d at 725 (citing Smith Wholesale Co., Inc. v. Philip Morris USA, Inc., 219 F. App'x 398, 409 (6th Cir. 2007)). In particular, the Sixth Circuit typically infers monopoly power "where the market share is *75-80% or greater*." Byars, 609 F.2d at 850 (emphasis added). The Sixth Circuit has also endorsed Judge Learned Hand's

14

"classic explanation" of market share sufficient to constitute monopoly power: "over ninety . . . percentage [market share] is enough to constitute a monopoly; it is *doubtful whether sixty or sixty-four percent would be enough*; and certainly thirty-three percent is not." Spirit Airlines, 431 F.3d at 935 (emphasis added) (quoting United States v. Aluminum Co. of America, 148 F.2d 416, 424 (2d Cir. 1945)).

10. The Sixth Circuit has also taken a demanding approach to whether a plaintiff has demonstrated market share "approach[ing] monopoly power" sufficient to satisfy the "dangerous probability of success" element of an attempted monopolization claim. Langenderfer, 917 F.2d at 1431-32; Tarrant, 12 F.3d at 615. Twice, the court has held that a market share between 30 and 40 percent was insufficient evidence that a firm had even the capacity to monopolize. See Richter, 691 F.2d at 826; Langenderfer, 917 F.2d at 1431.

11. Plaintiffs have not established MNPD's market share. As discussed above, Dr. Mathis conducted a "buy-side" study of a "reasonable labor pool" that offers no insight into MNPD's share of the relevant sell-side market. Moreover, even if Dr. Mathis's labor pool analysis were relevant and reliable, it is insufficient to demonstrate monopoly power because MNPD's "share" is below the high threshold required under Section 2. Byars, 609 F.2d at 850. Indeed, Dr. Mathis implicitly acknowledged this shortfall by concluding that MNPD has only "considerable market power," not *monopoly* power. (See Ex. 40 at 3-4). Finally, Plaintiffs' anecdotal evidence at trial concerning MNPD's performance in the relevant market does not alone support a finding, of monopoly power. Accordingly, Plaintiffs have failed to prove, by a preponderance of the evidence, that MNPD possesses sufficient market share for the Court to infer the existence of monopoly power in the relevant market.

**Anticompetitive Conduct**

12. Even if Plaintiffs had met their burden regarding monopoly power in the relevant market, their Section 2 claims still fail because Plaintiffs have not proven that MNPD engaged in anticompetitive conduct. There is insufficient proof that MNPD "willful[ly] acqui[red], maint[ained], or use[d] [monopoly] power by anti-competitive or exclusionary means as opposed to 'growth or development resulting from a superior product, business acumen, or historic accident,'" or "engage[d] in anti-competitive practices the specific design of which [was] to build a monopoly or exclude or destroy competition." Conwood, 290 F.3d at 782 (quoting Aspen Skiing, 472 U.S. at 595-96 and Smith, 703 F.2d at 954); see also Superior Prod. P'ship, 784 F.3d at 319. Neither have Plaintiffs proved that MNPD engaged in other anticompetitive behavior designed to destroy competition. See Richter, 691 F.2d at 823 (explaining that anticompetitive conduct is "designed to destroy competition, not just to eliminate a competitor").

13. This Court does not find that Chief Anderson's five-year transition plan was intended to "destroy competition." His plan was largely inward-looking and concerned MNPD and MNPD officers. (See Ex. 68). Chief Anderson outlined specific and credible business reasons and police powers for the transition plan, including that MNPD sought better control over its own officers; better management of its reputation; limitation of complaints; improved training and risk management; and a better ability to provide for the public safety. Likewise, Plaintiffs offered insufficient evidence that changes to the Special Events Committee meetings were intended to "destroy competition." In short, Plaintiffs have not established, by a preponderance of the evidence, MNPD's pursuit of contracts for MNPD officers was anything other than vigorous competition upon completion of the transition plan. See Richter, 691 F.2d at 823 (observing that an "attempt to succeed in business" is not punishable under the Sherman Act).

16

## **CONCLUSION**

For these reasons, the Court concludes that Plaintiffs have not established a basis for relief under Section 2 of the Sherman Act. The Clerk shall enter judgment for the Defendant.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE